IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HEARTLAND CEMENT CO., et al.  :    CIVIL ACTION
                              :
      v.                      :
                              :
ULTIMAX CEMENT CORP., et al.  :    No. 10-4328

MEMORANDUM

McLaughlin, J.                               January 24, 2011

      This action arises from two contractual agreements between the plaintiffs and the defendants regarding the manufacture of certain cement products, the "Amended Supply Agreement" and the "Security Agreement." The plaintiffs, Heartland Cement Company (HCC) and Heartland Cement Sales Company (HCSC) (together, "Heartland"), have sued the defendants, Ultimax Cement Corporation (UCC), Ultimax Cement Manufacturing Corporation (UCMC), KA Group, LP, and Hassan Kunbargi (together, "Ultimax"), to recover for material default of payment obligations under the two agreements.

      On August 25, 2010, the plaintiffs filed a complaint alleging that the defendants have failed to make payments as required by the Amended Supply Agreement and that, as a result, they are entitled to both payments and interest due and to exercise certain rights that are triggered by the default per the Security Agreement.

On September 28, 2010, the defendants filed a Motion to Dismiss or Stay in Favor of Arbitration. The defendants argue that the Amended Supply Agreement and the Security Agreement are so intertwined with a third agreement, the "Distribution Agreement," that the arbitration provision in the Distribution Agreement also applies to claims under the Amended Supply and Security Agreements. The plaintiffs deny that these agreements are sufficiently related so as to require that claims arising out of the Amended Supply and Security Agreements be subject to compulsory arbitration. Because the Court is persuaded by the plaintiffs' arguments, it will deny the defendants' motion.

I. Facts

   A. Legal Standard

A motion to stay a suit in favor of arbitration is treated as a motion for summary judgment because the Court must decide the question of whether the parties have agreed to submit the dispute to arbitration. Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 & n.9 (3d Cir. 1980). Consequently, the Court will view the facts in the light most favorable to the plaintiff.[1]

---

[1] On a motion for summary judgment, a court must view the evidence and draw reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is proper if the pleadings and other

In reaching its decision, the Court relies on the complaint and accompanying exhibits, and on the parties' papers regarding the motion to dismiss or stay in favor of arbitration. The Court will limit its discussion of the parties' dealings to those details that are relevant to the pending motion.

B. Agreements

Plaintiff HCC manufactures cement products at its facility in Kansas. HCSC sells specialty cement products under license from Ultimax and arranges for the manufacture of those products by its "affiliated companies" (i.e., HCC). Defendant UCC is engaged in the business of selling specialty cement products. The plaintiffs allege that UCC is the same company as, or the "alter ego" of, UCMC. KA Group is a limited partnership, and Hassan Kunbargi is the shareholder, president, and CEO of UCC, and a partner in and president of KA Group. Compl. ¶¶ 5-16.

There are three agreements between the parties involved in this dispute: (1) the Amended and Restated Supply and Storage Agreement ("Amended Supply Agreement"), (2) the Security Agreement and Addendum ("Security Agreement"), and (3) the Distribution Agreement.

---

evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### 1. Amended Supply Agreement

On January 1, 2000, UCC and HCC entered into the first Supply and Storage Agreement. In it, UCC agreed to pay HCC to manufacture certain "Ultimax Products," i.e., specialty cement products. By the end of August 2000, however, Ultimax[2] owed HCC over $2.2 million for unpaid cement manufacturing and production. Compl. ¶¶ 24-25; Amended and Restated Supply and Storage Agreement ("Amended Supply Agreement") § 4.1, Ex. A to Compl.

Thereafter, on September 21, 2000, the same parties entered into the Amended Supply Agreement in order to restructure the debt and establish a mechanism for HCC to collect on the money owed to it by Ultimax. In the agreement, HCC agrees to roll the entire debt into a one-time $2.5 million secured production credit line to cover all of the amounts owed to HCC. The Amended Supply Agreement provides that HCC shall be repaid at a rate of $500,000 annually beginning January 1, 2001, and that the credit line will be secured by a first lien on Ultimax's accounts receivables and certain patents owned by Ultimax. The agreement contains a Kansas choice-of-law provision, but does not include an arbitration clause. Amended Supply Agreement §§ 8.3, 17.1.

---

[2] Although the Amended Supply Agreement technically only involved UCC, the parties use the term "Ultimax" throughout the agreements and their correspondence to refer variously to UCC, UCMC, or all of the Ultimax Defendants collectively.

Several provisions of the Amended Supply Agreement make reference to the Distribution Agreement - executed one day later - which grants HCSC a license to distribute Ultimax products. For example, the Amended Supply Agreement states that it amends and restates the prior Supply Agreement so as to be "compatible with a Distribution Agreement [] which the parties are entering into concurrently with this Agreement." The Amended Supply Agreement also acknowledges that among the cement products that HCC will manufacture for Ultimax are those that will be produced "for sale and distribution by Heartland" pursuant to the Distribution Agreement. Finally, the Amended Supply Agreement provides that "this agreement and the Distribution Agreement constitute the entire understanding and agreement between the parties with respect to the subject matter hereof." Id. §§ 1.1, 3.1, 15.1.

2. Security Agreement

Concurrently with the Amended Supply Agreement, HCSC (HCC's "sister company") entered into the Security Agreement with UCMC and KA Group, which granted HCSC a first priority lien on and first priority continuing security interest in Ultimax's accounts receivable and certain patents held by Ultimax. The purpose of the Security Agreement was to secure Ultimax's obligation for payment on the secured credit line due to HCC

under the Amended Supply Agreement. The Security Agreement provides that Ultimax's failure to meet its payment obligations under the Amended Supply Agreement constitutes an "Event of Default," and that upon such an event, HCSC is appointed as "attorney-in-fact" in connection with Ultimax's accounts receivable and the patents named in the agreement. Compl. ¶¶ 30-37; Security Agreement ("Security Agreement") §§ 1, 3.4, 4, 5, Ex. B to Compl.

On October 25, 2002, the parties executed an Addendum to the Security Agreement in which Kunbargi also agreed to be bound in the same manner as KA Group, as he is the sole owner of one of the patents provided as collateral. Addendum 1 to Security Agreement, Ex. C to Compl.

The Security Agreement states that "[t]his Agreement, the Supply Agreement, and the Distribution Agreement by and between Heartland, the owner and Ultimax contain the entire understanding and agreement of the parties with respect to the subject matter hereof." Security Agreement § 6.1. The Security Agreement also contains a Kansas choice-of-law provision, but no arbitration clause. Id. § 6.3.

3. <u>Distribution Agreement</u>

On September 22, 2000, UCMC, KA Group, and HCSC executed the Distribution Agreement. The Distribution Agreement granted HCSC a conditional 20-year license to sell, market and distribute Ultimax Products. The agreement establishes a revenue-sharing scheme, and provides that "Heartland shall have the right to offset any amounts payable by it to Ultimax against any amounts due from Ultimax to Heartland Cement under the Supply Agreement or to Heartland or any of the affiliated companies." In other words, Heartland can, if it chooses, offset any payments it owes to Ultimax under the Distribution Agreement, by payments owed to it under the Amended Supply Agreement. Mot. to Dismiss, p. 3; Distribution Agreement ("Distribution Agreement") §§ 3, 15, Ex. 1 to Mot. to Dismiss.

The Distribution Agreement makes reference to the fact that "Heartland Cement" manufactures specialty cement products for Ultimax. The Distribution Agreement also states: "This Agreement, together with the Supply Agreement... set forth and constitute the entire agreement between the parties hereto with respect to the subject matter hereof..." The Amended Supply Agreement was included as an attachment to the Distribution Agreement. <u>Id</u>. §§ C, 28(i).

The Distribution Agreement is the only one of the three agreements that contains an arbitration clause. The clause

provides in relevant part that "[a]ny controversy or claim arising out of or relating to this Agreement shall be finally settled by final and binding arbitration..." Id. § 28(s).

    C.    <u>Motion to Dismiss or Stay in Favor of Arbitration</u>

According to the plaintiffs, the defendants have failed to make the annual payment of $500,000 to Heartland as required by the Amended Supply Agreement and that, as a result, an "Event of Default" has occurred under the Security Agreement. The plaintiffs seek damages for breach of contract and declaratory relief concerning the collateral described in the Security Agreement.

In their Motion to Dismiss or Stay in Favor of Arbitration, the defendants argue that the Amended Supply and Security Agreements - out of which the plaintiffs' claims arise - are so interrelated with the Distribution Agreement, that the latter's arbitration clause should apply to the plaintiff's claims so as to compel arbitration.

The defendants also offered some additional details concerning the parties' dealing that make clear that there is some disagreement as to what amount was owed by Heartland to Ultimax under the revenue-sharing scheme in the Distribution Agreement. On March 17, 2010, Ultimax's counsel wrote to Heartland requesting arbitration concerning the amount owed under

the Distribution Agreement. Heartland rejected the request in a March 22, 2010 letter, stating that Ultimax's request for arbitration under the Distribution Agreement was premature because Ultimax had failed to follow the prescribed procedures regarding royalty disputes. Exs. 4 & 5 to Mot. to Dismiss.

On May 5, 2010, Ultimax informed Heartland that it owed Ultimax more than $2.5 million based on Ultimax's calculations of the amount due under the Distribution Agreement versus the amount Ultimax owed to Heartland under the Amended Supply Agreement. Heartland responded on May 14, 2010, stating that in fact Ultimax owed Heartland over $1.1 million as of March 31, 2010. Exs. 6 & 7 to Mot. to Dismiss.

The defendants assert that they filed for arbitration under the Distribution Agreement with the American Arbitration Association near the end of July, and that it is being administered out of the Dallas Office. In their opposition, the plaintiffs dispute that the defendants filed for arbitration near the end of July, pointing to a stamped copy of the defendants' Demand for Arbitration, dated September 24, 2010, one month after this action was filed. Ex. 1 to Pls.' Opp. to Mot. to Dismiss. According to the plaintiffs, the defendants have still not perfected their demand for arbitration by paying the requisite filing fee to proceed with arbitration.

Essentially, what the defendants argue is that because the plaintiffs are entitled to offset the amount owed to Ultimax under the Distribution Agreement by the amount owed to them under the Amended Supply Agreement, it is impossible for the Court to determine whether the defendants are in breach of the Amended Supply and Security Agreements (i.e., whether they failed to pay their outstanding debt), without first considering whether Heartland correctly calculated and applied its revenue sharing under the Distribution Agreement. For example, in a March 1, 2010 letter from Heartland to Ultimax detailing Ultimax's outstanding debt, Heartland explicitly offsets amounts it owes to Ultimax under the Distribution Agreement by the amount Ultimax owes it under the Amended Supply Agreement. Ex. 3 to Mot. to Dismiss. The defendants also note that the three agreements are substantially related, pointing to the fact that the agreements repeatedly reference each other, and were executed closely in time and by the same parties.

In response, the plaintiffs emphasize that neither the Amended Supply Agreement nor the Security Agreement contains an arbitration provision. The plaintiffs also argue that, unlike the Amended Supply and Security Agreements, which depend on one another for their essential terms and relate to the same subject matter, both of those agreements are distinct from and independent of the Distribution Agreement. According to the

plaintiffs, the agreements do not incorporate or depend on one another, and do not relate to the same subject matter.

II. Analysis

In determining whether a particular dispute falls within a valid arbitration agreement's scope, "there is a presumption of arbitrability." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 524 (3d Cir. 2009). Doubts regarding the scope of an arbitration clause should generally be resolved in favor of arbitration. Id. at 527. Of course, arbitration is a matter of contract, and a party cannot be forced to arbitrate a dispute if it has not agreed to do so. AT&T Technologies, Inc. v. Comm'ns Workers, 475 U.S. 643, 648 (1986).

The presumption of arbitrability is particularly applicable where, as here, the arbitration clause is broad. Battaglia v. McKendry, 233 F.3d 720, 725 (3d Cir. 2000). The clause purports to cover any controversy or claim "arising out of or relating to" the Distribution Agreement. As such, the question is whether the Distribution Agreement is sufficiently "related to" the Amended Supply and Security Agreements to warrant applying the Distribution Agreement's arbitration clause to claims arising out of the other two agreements. When two agreements are sufficiently related, courts have generally held

11

that an arbitration clause in one may be applied to claims arising out of the other. See Nat'l Am. Ins. Co. v. SCOR Reinsurance Co., 362 F.3d 1288, 1291-92 (10th Cir. 2004); ARW Exploration Corp. v. Aguirre, 45 F.3d 1455, 1462 (10th Cir. 1995); Neal v. Hardee's Food Sys., Inc., 918 F.2d 34, 37 (5th Cir. 1990); Pan Atl. Reinsurance Co. v. Republic Ins. Co., 1992 U.S. Dist. LEXIS 7619, at *13 (S.D.N.Y. May 20, 1992)).

The question therefore becomes whether the Distribution Agreement is sufficiently "related" to the Amended Supply and Security Agreements for the purposes of requiring the plaintiffs to arbitrate their claims. The inquiry is a fact-specific one that looks to a number of different factors to determine whether separate agreements are sufficiently "related": (1) whether the agreements reference or incorporate one another, (2) whether the agreements depend on one another for their terms or existence; (3) whether the subject matter of the dispute is the same; (4) whether the parties to the agreement are the same, (5) whether the agreements were executed closely in time, and (6) whether the arbitration clause specifically excludes certain claims. See SCOR Reinsurance Co., 362 F.3d at 1291-92; Battaglia, 233 F.3d at 728; Personal Sec. & Safety Sys., Inc. v. Motorola, Inc., 297 F.3d 388, 390 (5th Cir. 2002); Consolidated Brokers Insurance Services, Inc. v. Pan-American Assurance Company, 427 F. Supp. 2d 1074, 1082 (D. Kan. April 3, 2006).

Although the Court finds that no factual issue material to this question is in dispute, and therefore summary judgment is appropriate here, there is evidence in the record to support both sides' positions and the question is a close one.

First, as the Court noted above, the Amended Supply and Security Agreements make several references to the Distribution Agreement, and vice-versa. Indeed, the Amended Supply Agreement was included as an attachment to the Distribution Agreement. The agreements do not, however, incorporate or rely on one another for their essential terms or existence. Cf. Markel Corp. Group Ins. Co. v. PMA Capital Ins. Co., 2005 WL 327534 (E.D. Pa. Feb. 9, 2005). Furthermore, the subject matter of the contracts is different. While all three relate to Ultimax cement products, one in involves an agreement by Heartland to manufacture products for Ultimax and to restructure debt owed by Ultimax, and the other involves a license for Heartland to sell Ultimax products in exchange for certain revenue-sharing rights.

Apart from the fact that the Distribution Agreement granted Heartland a license to sell some of the products it manufactures per the Amended Supply Agreement, the most significant connection between these agreements is Section 15(e) of the Distribution Agreement, which states that Heartland has the right to offset any payments due to Ultimax under the Distribution Agreement by money owed to it pursuant to the

13

Amended Supply Agreement.  The plaintiffs argue that there is no need to decide whether Heartland properly calculated and applied its revenue sharing under the Distribution Agreement in order to determine whether Ultimax is in default of its repayment obligations under the Amended Supply Agreement.  The defendants admit that, although Heartland was not required to offset Ultimax's outstanding debt with the money it owed under the Distribution Agreement, because it chose to do so, these agreements have become interdependent in such a way that the arbitration clause must be applied to the plaintiffs' claims.

The Court is ultimately persuaded that this provision does not render the Amended Supply Agreement and the Distribution Agreement "dependent" on one another.  While it is true that the Distribution Agreement gives Heartland the option to offset the debt in this way, the Distribution Agreement does not *require* that Heartland (specifically, HCC) do so.  That Heartland may have later chosen to exercise that option by deducting the amounts it owed under the revenue sharing from the debt owed by Ultimax does not transform otherwise independent agreements.  Although the defendants argue that the Court will have to consider whether Heartland correctly calculated its revenue sharing under the Distribution Agreement, the Court declines to predict how Heartland will calculate any debt it claims is owed

by Ultimax (i.e., whether it will choose to offset the debt by the amount it owes under the Distribution Agreement).

Turning to the last few factors, the agreements were executed closely in time[3] and by the same parties[4], and the arbitration clause does not exclude any claims. The Court concludes, however, that the Amended Supply and Security Agreements and are not so intertwined with the Distribution Agreement as to require that the plaintiffs' claims be subject to compulsory arbitration. It is instructive to compare the relationship among these agreements to the relationship between the Amended Supply Agreement and the Security Agreement, which explicitly depend on and incorporate one another in ways that are central to the agreements. Indeed, the Security Agreement exists only to secure the credit line provided for in the Amended Supply Agreement. By contrast, the purpose of the Distribution

---

[3] The Court does note that the first Supply Agreement was executed several months earlier and that the parties had been operating under that agreement for nearly nine months before either the Amended Supply or the Distribution Agreement were executed. All of the agreements upon which the parties explicitly rely, however, were executed within one day of one another.

[4] The plaintiffs argue that the parties to the agreements are not the same, and that HCC (a party only to the Amended Supply Agreement) never agreed to arbitrate its claims. Even assuming that HCC was not a party to the Distribution Agreement, non-signatories to an arbitration provision can still be bound by it under a theory of estoppel, which would likely apply here to bind HCC. See Invista S.A.R.L. v. Rhodia, S.A., 625 F.3d 75, 85 (3d Cir. 2010).

Agreement - to grant Heartland a license to distribute certain products - is distinct from that of the other two.  Nothing in the language of the Amended Supply or Security Agreements purports to incorporate terms from the Distribution Agreement, and the contracts do not depend on one another for their existence.  The Distribution Agreement's primary link to the other two agreements is a term that relates only to the means by which Heartland may satisfy its payment obligations under the revenue-sharing scheme.  This provision is not an essential term of the Distribution Agreement, nor is it critical to the interpretation of the Amended Supply or Security Agreements.

Finally, the Court is troubled by the fact that, although the defendants profess a desire to arbitrate the parties' claims, they have still failed to perfect their demand for arbitration.  The plaintiffs have expressed their concern that further delay by the defendants could be harmful to their interests in the collateral described in the Security Agreement and would ultimately affect their ability to recover on any claims.  Given the continued delay in moving the arbitration process forward and the potentially real threat to the collateral at issue, the Court shares the plaintiffs' concerns.

III. Conclusion

The Court finds that the Distribution Agreement is not sufficiently related to the Amended Supply and Security Agreements to require that claims arising out of the latter be subject to the arbitration provision in the former. The Court will therefore deny the defendants' Motion to Dismiss or Stay in Favor of Arbitration.

An appropriate order shall follow separately.